```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- X
                                                                        :
JOHNNIE L. PETWAY,                                                      :    12-CV-279 (ARR)(LB)
                                                                        :
                Plaintiff,                                              :    NOT FOR ELECTRONIC
                                                                        :    OR PRINT PUBLICATION
       -against-                                                        :
                                                                        :    OPINION & ORDER
CITY OF NEW YORK, POLICE OFFICER MICHAEL                                :
WILLIAMS, POLICE OFFICER TAMIKO PATTERSON,                              :
POLICE OFFICER DENNIS WESTBROOK, POLICE                                 :
OFFICER JOHN DOE, and SGT. ANTHONY                                      :
CASTELLANA,                                                             :
                                                                        :
                Defendants.                                             :
                                                                        :
----------------------------------------------------------------------- X
```

ROSS, United States District Judge:

Johnnie L. Petway ("plaintiff") brought suit pursuant to 42 U.S.C. § 1983 against the City of New York (the "City") and several individual officers for a litany of violations of his constitutional rights in connection with his arrest on October 17, 2010, in Brooklyn, New York.[1] Defendants move for summary judgment as to all of plaintiff's claims. For the reasons stated below, defendants' motion is granted, and the suit is dismissed.

## BACKGROUND[2]

On the evening of October 17, 2010, around 8:00 p.m., plaintiff's then-wife, Sharmaine Edwards ("Edwards"), was outside of her and plaintiff's home at 556 Gates Avenue in Brooklyn,

---

[1] Although plaintiff acted pro se in commencing this suit, he has since obtained counsel and is represented by counsel in opposing the instant motion.
[2] Except as otherwise noted, the following facts are not in dispute. Where a factual dispute exists, the court construes the disputed facts in the light most favorable to plaintiff as the non-moving party. However, to the extent plaintiff has asserted any additional facts in his memorandum of law that are unsupported by citation to evidence in the record, the court does not consider such assertions.

1

New York.[3]  Defs.' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Defs. Facts") ¶¶ 13, 16.  Edwards was speaking with her neighbor, Omega Goodrich, when a young female ("A.G."), who is a relative of Ms. Goodrich, came out of Ms. Goodrich's home at 558 Gates Avenue and threatened to "get a knife" and stab Edwards.  Decl. of Richard K. Weingarten ("Weingarten Decl."), Ex. F, Dep. of Sharmaine Edwards ("Edwards Dep.") 39-41.  As a result of this threat, Edwards called "9-1-1" to request police assistance[4], and A.G. went back inside 558 Gates Avenue.  Defs. Facts ¶¶ 19-20.  Police officers arrived on the scene shortly thereafter.  Id. ¶ 21.

By the time the officers arrived, another individual ("Jimmy") had also come outside.  Edwards Dep. 58.  Edwards was upset with Jimmy because, several days before, she had been sitting on the steps of 556 Gates Avenue when Jimmy approached her and spat on her for no apparent reason.  Defs. Facts ¶¶ 13-14.  When the police officers arrived, Edwards, who was irate, told them about the earlier spitting incident with Jimmy as well as about the threat from A.G. a few minutes prior to the police officers' arrival.  Id. ¶ 22.

While Edwards was speaking with police outside of 556 Gate Avenue, plaintiff overheard from inside of his residence what he believed to be police officers laughing at his wife.  Id. ¶ 24.  He came outside of his residence to ask which officer was in charge and wrote down defendant Sergeant Anthony Castellana's name before going back inside his home.  Id. ¶¶ 25-26.

---

[3] In response to this and many other factual assertions regarding the events involving Edwards prior to plaintiff's own arrest, plaintiff states that he "can neither admit not deny" such facts.  Because defendants' factual assertions are based on the admissible evidence of deposition testimony in the record and have not been "specifically controverted" with any evidence from plaintiff as required under Local Rule 56.1, such facts are treated as undisputed.  Moreover, the court disagrees with plaintiff's contention that such facts are irrelevant.  Such facts are highly relevant to an understanding of the information available to the arresting officers on which the existence of probable cause for plaintiff's arrest depended.

[4] Plaintiff disputes that Edwards called "9-1-1" and avers that he himself called the police.  Pl.'s Statement in Opp'n to Defs. Facts ("Pl. Facts") ¶ 19.  It is immaterial who called the police, as there is no dispute that the police were called to the scene.

At some point while Edwards was talking to police, Jimmy began to walk down the street away from them. Id. ¶ 27. Edwards started to pursue Jimmy with the intent of spitting on him. Id. ¶ 28. Jimmy, who was holding his daughter's hand at the time, began to run, and Edwards also began to run after him.[5] Id. ¶¶ 27-29. As she ran, Edwards, who had a pen in her hand, heard a male officer yell, "She has a knife." Id. ¶¶ 28, 30. According to Edwards, during these events, Jimmy's daughter was "screaming like hell" and yelling, "Help, help. Daddy. Daddy." Edwards Dep. 84. Also according to Edwards, another female onlooker watching the scene heard Jimmy's daughter and exclaimed, "Oh, my god. She is going to hurt the little girl." Id.

Jimmy stopped running when he reached a day care center down the street. Defs. Facts ¶ 32. When Edwards caught up with Jimmy and his daughter in front of the day care center, Jimmy told Edwards that he had not spat on her, and Edwards replied, "You bastard, you know you spat on me." Edwards Dep. 86. She then told Jimmy's daughter, "Little girl, your daddy is a creep." Id. Around that time, the police van pulled up in front of the day care center, and police officers handcuffed Edwards. Defs. Facts ¶ 34.

Plaintiff "heard a lot of commotion" and came back outside to look down the street, where he saw "a caravan of police vehicles" and a "whole bunch of people" in front of the day care center at 576 Gates Avenue. Weingarten Decl., Ex. C, Dep. of Johnnie Petway ("Plaintiff Dep.") 121. According to plaintiff, there were "better than twenty" people in the area. Id. Seeing this commotion, plaintiff walked down the street toward the day care center where he observed that Edwards was "in handcuffs under arrest." Id. at 123. When he arrived in front of

---

[5] According to Edwards, Jimmy's daughter was ten or eleven years old. Edwards Dep. 84. Plaintiff, without reference to evidence, insists that Jimmy's daughter is alleged to be fourteen years old. Pl. Facts ¶ 27. Nonetheless, this fact is immaterial.

the day care center, plaintiff asked aloud, to no one in particular, who the arresting officer was. Defs. Facts ¶ 38.

Plaintiff, who was "at least three or four feet" from Edwards, Pl. Dep. 134, heard Edwards ask him to "take my pen before they do something," id. at 128. Plaintiff recalls that Edwards had the pen, probably held in her mouth, and spat it out for him to pick up. Id. at 128, 131, 133. The pen fell into the curb "a couple of feet" from Edwards, and plaintiff picked it up. Id. at 131, 133-34.

According to plaintiff, at that point, he heard someone tell him to "get back or whatever," so he "started backing up." Id. at 134. Plaintiff is unsure whether police had told him to get back before this. Defs. Facts ¶ 42. He does not recall whether an officer said anything to him besides to get back that single time but admits that they "may have." Pl. Dep. 135.

The description of events provided by the officers differs from plaintiff's account. According to defendant Police Officer ("P.O.") Tamiko Patterson, she observed plaintiff "in the front of the van door blocking [Edwards's] way" and being "highly upset, enraged, being disorderly, making a scene in public." Weingarten Decl., Ex. K, Dep. of Police Officer Tamiko Patterson ("Patterson Dep.") 63. She states that plaintiff was asked "numerous times" by an officer to "move out of the way." Id. Defendant P.O. Michael Williams also states that plaintiff was "standing in the proximity of the officers close to the second door of the van" and "physically blocking the door" of the van so that the officers could not put Edwards inside. Weingarten Decl., Ex. L, Dep. of P.O. Michael Williams ("Williams Dep.") 53. According to P.O. Williams, plaintiff was asked to move "several times" but verbally refused despite warnings

4

from the officers who asked him to move. Id. at 54. Unsurprisingly, plaintiff disputes this version of events and denies being "near" Edwards. Pl. Facts ¶ 40.

Plaintiff states that, after picking up the pen from the curb and following directions to back up, defendant P.O. Dennis Westbrook then started bumping and pushing him back with both hands to plaintiff's chest even though plaintiff was already complying with the order to "get back." Pl. Dep. 134-36. Plaintiff told P.O. Westbrook that there was "no need for him to put his hands on [plaintiff]." Id. at 135. According to plaintiff, P.O. Westbrook's contact with him was a "slight shove" three or four times. Id. at 136-37. Plaintiff did not fall or hit himself on anything as a result of these shoves, and he experienced no resulting pain or injury nor did he receive any medical treatment. Id. at 137-38.

Plaintiff told P.O. Westbrook that, because P.O. Westbrook was being a "tough guy," plaintiff wanted his name and badge number. Defs. Facts ¶ 45. P.O. Patterson then asked plaintiff for identification. Id. ¶ 46. Plaintiff responded that he would provide identification only after he finished writing down P.O. Westbrook's name and badge number. Id. ¶ 47. After writing the information down, he handed P.O. Patterson his identification and, while facing P.O. Patterson, was hit in the upper back by an unknown white, male police officer. Id. ¶¶ 48-49. Plaintiff is unaware of the identity of the officer who hit him. Id. ¶ 55. Plaintiff fell slightly forward but grabbed hold of a gate in front of him to steady himself. Id. ¶ 51. In his deposition, plaintiff states that he does not recall feeling any pain from being hit and that he did not go to a doctor for any injuries resulting from the hit. Pl. Dep. 153. Plaintiff indicates in his deposition that he had preexisting spinal injuries but that he has no basis to say whether the hit might have caused "any extra damage" to his spine. Id. He admits that he has no actual reason to believe that the hit caused him any injury. Id. at 154.

5

Almost immediately thereafter, P.O. Williams handcuffed plaintiff.  Id.  Plaintiff was subsequently charged with obstructing governmental administration and disorderly conduct.  Defs. Facts ¶ 54.  After his arrest, plaintiff was transported to the 79th Precinct.  Id. ¶ 58.  At the precinct, P.O. Patterson's partner, P.O. Miranda, conducted a check for warrants in plaintiff's name and located an outstanding warrant for plaintiff's arrest.[6]  Id. ¶¶ 59-61.  At some point thereafter, plaintiff was informed of the outstanding warrant.  Id. ¶ 63.

---

[6] Defendants have provided a copy of the warrant, issued by Kings County Criminal Court and dated February 23, 2009, under Docket No. 2009SK017542, which P.O. Miranda located. Weingarten Decl., Ex. E.  In addition to P.O. Miranda's deposition testimony regarding her warrant search, Weingarten Decl., Ex. H, 48-49, defendants have also provided the court with a copy of the Desk Appearance Ticket for plaintiff's October 17, 2010, arrest, which notes that P.O. Miranda located an outstanding warrant type SAP3 and number 2009SK017542 at 9:18 p.m., Weingarten Decl., Ex. I.

According to defendants, the outstanding arrest warrant related to plaintiff's arrest on December 2, 2008, for which he received a summons for disorderly conduct.  Defs. Facts ¶ 8.  Plaintiff admits that he received a summons that day and that he failed to appear in court on February 23, 2009, as directed by the summons.  Pl. Facts ¶¶ 8-9.  Relying on no evidence other than his own statements, plaintiff insists that the matter was dismissed in his favor despite his failure to appear in court as required.  Pl. Facts ¶¶ 9-11.  Defendants, however, assert that plaintiff's failure to appear on February 23, 2009, resulted in the issuance of the warrant number 2009SK017542 that same day.  Defs. Facts ¶ 12.

Plaintiff denies the existence of such a warrant and asserts that, because such a warrant did not exist, P.O. Miranda could not possibly have found it when she claims to have searched for outstanding warrants on October 17, 2010.  However, plaintiff cites no evidence actually controverting the existence of the warrant.  He refers to Exhibit 8 (attached to his Local Rule 56.1 statement), which is a transcript of his appearance before the Kings County Criminal Court on October 18, 2010.  The court notes that this exhibit, like all of plaintiff's evidentiary submissions, is provided freestanding from any affidavit or declaration of personal knowledge and, therefore, need not be considered by the court.  See Spears v. City of N.Y., No. 10-CV-03461, 2012 WL 4793541, at *2 n.2 (E.D.N.Y. Oct. 9, 2012) (citing Local Rule 7.1(a)(3) and (b) and Fed. R. Civ. P. 56(c)(4)).  However, even were the court to consider plaintiff's submissions despite his counsel's glaring failure to follow proper procedure, it is unclear how the transcript from October 18, 2010, helps plaintiff's argument, as it acknowledges the existence of an outstanding SAP warrant number 2009SK017542 that was vacated only in court that day.  Pl. Facts, Ex. 8, at 2.

Bizarrely, plaintiff asserts, without any evidentiary support, that "no one can find [a] valid arrest warrant from February 23, 2009," despite the fact that defendants have found and produced precisely such a warrant.  Pl. Facts ¶ 61.  Even more bizarrely, plaintiff asserts, again without any evidentiary support, that "Carl E. Brown" listed on the February 23, 2009, warrant is "not a Judge" but a "Clerk in Brooklyn (Ms. Brown)."  Id. ¶ 12.

Instead, plaintiff asks the court to consider what he submits as Exhibits 5 and 6 (again, these documents, which are identical except for plaintiff's highlighting, are not attached to an affidavit of personal knowledge).  Plaintiff asserts that these documents show that a warrant was recommended by a JHO Schwartwald on February 23, 2009, and issued by a Judge Jeong on February 26, 2009.  Id.  In light of plaintiff's failure (1) to provide any affidavit of personal knowledge as to what these documents are or from whence they come, (2) to indicate how, even assuming that these documents are what they purport to be, they are inconsistent with the issuance of a warrant on February 23, 2009, and (c) to present any evidence controverting the existence of the warrant produced by defendants, the court cannot conclude that plaintiff has shown any genuine issue of material fact on this issue.

Accordingly, the court treats as uncontroverted defendants' assertion that P.O. Miranda located an outstanding warrant for plaintiff's arrest.  Ultimately, however, this issue does not determine the outcome of defendants' motion.

The next day, on October 18, 2011, around 11:00 a.m., plaintiff was transported to central booking in a van with approximately seven or eight other individuals. Id. ¶ 64. Two police officers, P.O. Cortez and P.O. Trevaris, who are not defendants in this case, escorted plaintiff and the other individuals in the van. Id. ¶ 65. While in the van, P.O. Cortez and P.O. Trevaris provided several of the other prisoners with cigarettes and allowed them to smoke despite plaintiff's objections and his complaint that he was "allergic" to smoke because he had asthma. Id. ¶¶ 66-67; Pl. Facts ¶¶ 66-67.

Plaintiff was arraigned on October 18, 2010, and released from custody thereafter. Defs. Facts ¶ 68. On December 2, 2010, plaintiff returned to criminal court and accepted an Adjournment in Contemplation of Dismissal ("ACD") with regard to his October 17, 2010, arrest.[7] Id. ¶ 70; Pl. Dep. 180-81.

Plaintiff's pleadings can be liberally construed as raising federal constitutional claims for false arrest, malicious prosecution, use of excessive force, First Amendment retaliation, violation of equal protection, and unconstitutional conditions of confinement. Plaintiff also asserts a Monell claim for municipal liability and various state law claims.[8] Defendants move pursuant to

---

[7] In his Local Rule 56.1 statement of facts, plaintiff denies that he accepted an ACD for this arrest. Pl. Facts ¶ 70. However, in support of this contention, he refers to the transcript of his appearance before the Kings County Criminal Court on October 18, 2010, to argue that he did not consent to the entry of an ACD on that day. Plaintiff is confused. On that day, an ACD was granted with respect to the earlier charges from 2008 for which he had an outstanding warrant. See Weingarten Decl., Ex. J, at 2. As plaintiff himself stated in his deposition, he accepted an ACD with regards to his October 17, 2010, arrest when he returned to court on December 2, 2010. Pl. Dep. 180-81. He has provided no evidence to contradict his own statements.

[8] Although plaintiff does not address the merits of any state law claims in his memorandum of law, in his Local Rule 56.1 statement, he states that he "also makes various state court claims in the form of Assault and Battery, False Arrest and Malicious Prosecution, and Failure to Properly Train or Supervise." Pl. Facts ¶ 1. The court assumes this means that plaintiff wants to make these state law claims in this court, and not that he is making these claims in state court. There has been much ado in this case about whether plaintiff's complaint pleaded any state law claims and whether he properly filed a notice of claim as to any such claims. Ultimately, all the ado is for nothing because plaintiff's federal law claims are dismissed and, accordingly, the court declines to exercise pendent jurisdiction to consider any state law claims. See Giordano v. City of N.Y., 274 F.3d 740, 754 (2d Cir. 2001) (noting that, where all federal law claims dismissed, state law claims generally should also be dismissed).

7

Rule 56 of the Federal Rules of Civil Procedure for summary judgment on all outstanding claims.

## DISCUSSION

**A.**     **Standard for Summary Judgment**

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues but to determine whether there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)) (internal quotation marks and ellipses omitted).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994).

8

Once this burden is met, in order to avoid the entry of summary judgment, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

### B. False Arrest

Plaintiff claims that his warrantless arrest on October 17, 2010, violated the Fourth Amendment. Where probable cause exists, it is an "absolute defense" to a Fourth Amendment false arrest claim. Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006). Probable cause exists where an arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id. (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). "A court assessing probable cause must 'examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" Marcavage v. City of N.Y., 689 F.3d 98, 109 (2d Cir. 2012) (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)). The Fourth Amendment requires only that probable cause exists as to any crime, not that it exists for each crime charged or even for any of the particular crimes actually charged. Jaegly, 439 F.3d at 154.

Defendants argue that there is no genuine factual dispute as to the existence of probable cause to arrest plaintiff for obstruction of governmental administration ("OGA") in the second

9

degree. A person commits second degree OGA when "he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference . . . ." N.Y. Penal Law § 195.05. Defendants argue that there was probable cause to arrest plaintiff for OGA because, inter alia, he disobeyed several direct orders to step back from the scene of Edwards's arrest and approached her to take a small item from her after she was handcuffed. At a minimum, they argue, there is no dispute that the arresting officers are entitled to qualified immunity.[9] Plaintiff's memorandum effectively ignores the question of probable cause to arrest for OGA under § 195.05, but the court must nonetheless satisfy itself that there is no triable issue of fact on this point.

Under New York Penal Law § 195.05, interference in the arrest of a third party may constitute OGA. E.g., Matter of Carlos G., 626 N.Y.S.2d 137 (App. Div. 1995). Probable cause to arrest for OGA also may be found where, for example, an individual "refus[es] to obey orders to leave a premises, to exit a vehicle, to 'step back' from an accident scene or to keep away from an area where a disturbance is taking place." Wilder v. Vill. of Amityville, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003). Courts have previously held that, where police request an individual to "step back" and he refuses to do so, there is probable cause to arrest him for OGA. E.g., id. at 344-45 (probable cause where plaintiff ordered three times to step away from "zone of danger" but did not do so); Decker v. Campus, 981 F. Supp. 851, 857-58 (S.D.N.Y. 1997) (probable cause where plaintiff disobeyed orders to step back from scene of car accident involving his wife); People v. Romeo, 779 N.Y.S.2d 860, 861-62 (App. Div. 2004) (probable cause where

---

[9] Defendants also argue that, even if probable cause did not exist at the scene of the initial arrest, plaintiff's detention became lawful when an outstanding warrant was found shortly thereafter. Because the court finds that there was probable cause to arrest plaintiff for OGA, it does not reach this argument.

10

individual disobeyed orders to stay away while police attempted to transfer his arrested girlfriend from one police car to another); see also Marcavage, 689 F.3d at 109-10 (probable cause where demonstrators defied 17 directives to leave "no-demonstration zone"); Berger v. Schmitt, 91 F. App'x 189, 191 (2d Cir. 2004) (upholding finding of probable cause where plaintiff returned to premises after police ordered him to depart in their efforts "to contain what had only recently been a volatile situation"); Linehan v. State, 608 N.Y.S.2d 294 (App. Div. 1994) (probable cause where plaintiff "resisted the efforts of a court officer to keep her away from the area where a disturbance was taking place").

     According to defendants, plaintiff "drew close" to Edwards when he arrived on the scene of her arrest. Defs. Facts ¶ 40. Plaintiff disputes this characterization because he states that he "wasn't within inches" but was "[a]t least three or four feet" away. Pl. Dep. 133-34. This amounts to a semantic rather than a substantive dispute. In a situation where plaintiff admits that there was a "commotion" and a crowd of "better than twenty" people, id. at 121, a reasonable officer would not be unwarranted in the conclusion that a distance of "three or four feet" was "close" enough to the arrestee to pose a threat to the officers' containment of the situation. This is particularly the case given that the police officers perceived plaintiff to disobey multiple orders to "step back" from near Edwards. Although plaintiff insists that he started to back up as soon as he first heard an officer order him to "get back," he admits that he doesn't recall whether any of the officers said anything to him besides telling him to "get back" once and that they "may have." Id. at 135. P.O. Patterson and P.O. Williams both state that officers told plaintiff to step back from the area multiple times without him complying. Defs. Facts ¶ 40. This may be reconciled with plaintiff's insistence that he started to back up the first time that he heard an officer tell him to get back. The fact that it was the first time that he heard an officer tell him to

11

get back does not mean that it was the first time an officer had ordered him to do so.  Plaintiff's and defendants' versions of events are not incompatible, and plaintiff has introduced no evidence to dispute defendants' assertion that officers ordered him to step back multiple times, regardless of whether he heard those orders.  Whether plaintiff actually heard any prior orders to back up or intentionally disobeyed any such orders is not central to the probable cause analysis.  What matters for purposes of probable cause is whether, based on his perception of events, a reasonable officer on the scene would be justified in his belief that plaintiff was committing OGA.  See Decker, 981 F. Supp. at 858 & n.3.  A reasonable officer, seeing that plaintiff had been ordered to back up from an arrest area multiple times but had not yet done so, would be justified in perceiving that plaintiff was interfering or attempting to interfere in the officers' conduct of their duties.

The existence of probable cause is further bolstered by plaintiff's admission that he picked up the pen that his wife had seemingly spat out while handcuffed.  At that point in time, police had been called to the scene following a report to emergency services that an individual had threatened to get a knife and stab someone.  When they arrived at the scene, Edwards angrily started chasing a man and his young daughter down the street while holding a small object in her hand.  There was confusion about what the object was, as Edwards recounted an officer shouting, "She has a knife."  Defs. Facts ¶ 30.  Although the object appears to have been a pen, it is easy to see how it would be difficult to differentiate a pen from a small knife when in the hand of a woman angrily charging down the street.  In taking that object from a handcuffed Edwards as she was about to be placed into a police van, plaintiff would reasonably have appeared to intentionally insert himself "into steps taken by police officers to fulfill their duties."[10]  People v.

---

[10] Two unreported cases from this circuit are instructive.  In O'Donnell v. Card, No. 11 Civ. 3297(ER), 2013 WL

12

Beam, 866 N.Y.S.2d 564, 567 (Sup. Ct. 2008). A reasonable officer observing plaintiff's actions would have been justified in the belief that plaintiff may have taken contraband from the arrested Edwards, and plaintiff's actions diverted the attention of the officers from their duties in securing Edwards's arrest and taking control of a chaotic scene.

Based on the "totality of the circumstances" in this context, a reasonable officer would have been justified in the belief that plaintiff had committed OGA, and there was thus probable cause to arrest him. Illinois v. Gates, 462 U.S. 213, 230 (1983). Plaintiff has not raised any disputed issue of material fact to contradict this conclusion. Moreover, even were there not actual probable cause, the undisputed facts demonstrate that it would have been reasonable for the arresting officers to believe there was probable cause to arrest plaintiff for OGA,[11] and they are therefore entitled to qualified immunity on this claim. See, e.g., Escalera v. Nunn, 361 F.3d 737, 743 (2d Cir. 2004). Accordingly, summary judgment is granted to defendants on plaintiff's false arrest claim.

**C.     Malicious Prosecution**

Like a claim for false arrest, a § 1983 claim for malicious prosecution relies on the elements of relevant state common law. Gonzalez v. City of Schenectady, 728 F.3d 149, 162 (2d Cir. 2013). For a malicious prosecution claim to succeed under New York law, a plaintiff must

---

3929632, at *5-*6 (S.D.N.Y. July 30, 2013), a woman whose husband was in a scuffle with a police officer picked up a can of pepper spray dropped by the officer and placed it in a flowerbed. The court held that there was arguable, if not actual, probable cause to arrest her for OGA because, regardless of her innocuous intent in moving the pepper spray, she interfered with the police officer's ability to undertake his duties by moving an item used in those duties. Similarly, in Richardson v. N.Y.C. Health & Hospitals Corporation, No. 05 Civ. 6278(RJS), 2009 WL 804096, at *8-*9 (S.D.N.Y. Mar. 25, 2009), the court concluded that there was probable cause to arrest for OGA where the plaintiff had reached inside of a marked police vehicle in an attempt to remove the officer's clipboard and obtain his identifying information. Unlike in these two cases, plaintiff did not interfere with an item actually belonging to the police. However, his taking of the pen from Edwards is analogous in that he interfered with an item that was relevant to the officers' duties in completing the arrest and securing the area.

[11] This is known as "arguable probable cause," a standard which, contrary to plaintiff's suggestion, is not "made up" by defendants.

13

prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003). Plaintiff's claim must fail because the proceedings arising from his arrest on October 17, 2010, did not terminate in his favor. It is undisputed that on December 2, 2010, plaintiff accepted an ACD with regard to that arrest. Pl. Dep. 180-81. An ACD is not a termination in favor of plaintiff, and his malicious prosecution claim fails as a matter of law. Murphy v. Lynn, 118 F.3d 938, 949 (2d Cir. 1997) (citing Hollender v. Trump Vill. Coop., Inc., 448 N.E.2d 432 (N.Y. 1983)); Singleton v. City of N.Y., 632 F.2d 185, 193 (2d Cir. 1980); Anderson v. City of N.Y., 817 F. Supp. 2d 77, 92 (E.D.N.Y. 2011).

**D.      Excessive Force**

Plaintiff argues that being shoved by P.O. Westbrook, hit by the unknown officer, and subjected to a custodial ride in a smoke-filled van amounts to excessive force when "taken together." A claim for use of excessive force in connection with an arrest or seizure of a "free citizen" by a police officer will stand only where plaintiff establishes that the force used was excessive or unreasonable in light of the circumstances. Graham v. Connor, 490 U.S. 386, 395-97 (1989). However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. at 396 (internal quotation marks and citation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. Moreover, "[a] de minimis use of force will rarely suffice to state a Constitutional claim." Usavage v. Port Auth. of N.Y. & N.J., 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) (quoting Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)).

14

Here, even accepting plaintiff's version of events, the force allegedly used by P.O. Westbrook was, as a matter of law, <u>de minimis</u> and reasonable under the circumstances where, as discussed above, plaintiff approached the scene of an arrest where he himself states there was a crowd and commotion, and he was ordered to move out of the way.  Plaintiff himself admits that P.O. Westbrook gave him a "slight shove" causing him no pain or injury and requiring no medical treatment, and such amount of force cannot be considered excessive.  <u>See</u> <u>Husbands ex rel. Forde v. City of N.Y.</u>, No. 05 Civ. 9252(NRB), 2007 WL 2454106, at *13-*14 (S.D.N.Y. Aug. 16, 2007) (finding no excessive force where officer pushed plaintiff away from the area where another individual was being arrested but did not cause her to fall down or suffer any injuries); <u>Roundtree v. City of N.Y.</u>, 778 F. Supp. 614, 622 (E.D.N.Y. 1991) ("[T]o conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that <u>any</u> physical contact by an arresting officer with an arrested person is actionable.").

Similarly, the court cannot find that the force used by the unidentified "John Doe" officer was excessive, as plaintiff admits that it caused him no pain or other injury.  Moreover, plaintiff "cannot predicate claims against named defendants based on the acts of unnamed defendants," and he cannot proceed to trial on an excessive force claim against an unnamed individual where he does not allege the personal involvement of the named defendants in that alleged use of excessive force.  <u>Rasmussen v. City of N.Y.</u>, 766 F. Supp. 2d 399, 412 (E.D.N.Y. 2011); <u>see also</u> <u>Jean-Laurent v. Hennessy</u>, 840 F. Supp. 2d 529, 557 (E.D.N.Y. 2011).  Although plaintiff makes the conclusory assertion in his memorandum of law that Sergeant Castellana "was present throughout plaintiff's ordeal" and "failed to intercede," Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Opp'n") 26, he does not point to any evidence or facts indicating that Sergeant Castellana or

15

any of the other individual defendants had a "realistic opportunity to intervene" to prevent the "John Doe" officer from suddenly hitting him on the back.[12]  Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988)).

Finally, even were this court to entertain the unlikely possibility that twenty minutes of exposure to second-hand smoke could constitute excessive force, plaintiff has not alleged the personal involvement, or even the presence, of the named defendants during that van ride.  The court cannot oblige plaintiff's request to perform legal alchemy in mixing together his deficient allegations to concoct a viable excessive force claim.  Plaintiff has pointed to no triable issue of fact as to the use of excessive force, and this claim must also be dismissed.

E.      **First Amendment Retaliation**

Plaintiff claims that his First Amendment rights were violated in that he alleges that his arrest was in retaliation for his asking a question about the arrest of his wife.  A plaintiff claiming First Amendment retaliation must prove that "(1) he has an interest protected by the First Amendment; (2) defendant's actions were motivated or substantially caused by his exercise of that right; and (3) defendant's actions effectively chilled the exercise of his First Amendment right."  Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001).  Plaintiff's claim cannot survive summary judgment because, as discussed above, there was probable cause for his arrest, which obviates the need for an inquiry under the second prong of the First Amendment test, and

---

[12] This is only one ground for dismissing plaintiff's failure to intervene claim.  Liability premised on a failure to intercede requires not only a realistic opportunity to intercede but also that a failure to intercede "permitted fellow officers to violate a suspect's 'clearly established statutory or constitutional rights' of which a reasonable person would have known."  McLaurin v. New Rochelle Police Officers, 373 F. Supp. 2d 385, 395 (S.D.N.Y. 2005) (quoting Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997)).  Although the court need not reach the question for purposes of its decision, it notes that plaintiff has not shown that the "hit" from the "John Doe" officer violated plaintiff's "clearly established statutory or constitutional rights."

16

he has furthermore provided no specific proof of improper motivation.  See id. (dismissing First Amendment claim because no inquiry into underlying motive for arrest required where there was probable cause for the arrest); Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 120 (2d Cir. 1995) (same).

**F.      Equal Protection**

As to plaintiff's Fourteenth Amendment equal protection claim, he argues that "he and his wife were treated differently" by police.  Opp'n 27.  To the extent plaintiff attempts to argue a violation of his wife's constitutional rights, he is not the proper plaintiff to do so.  With respect to his claims on behalf of himself, "the Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).  Plaintiff's claim must fail from the start because the record is devoid of evidence indicating that plaintiff was treated differently from other persons similarly situated.[13]  Treatment of a plaintiff that is disparate from that afforded "similarly situated" individuals is "the sine qua non" of a LeClair claim, and accordingly plaintiff's equal

---

[13] When questioned about his equal protection claim during his deposition, plaintiff referred vaguely to a "difference in police mindset in certain neighborhoods and certain geographic areas so it is a whole lot of stuff."  Pl. Dep. 191.  He stated that he was treated differently "based on this geographic location."  Id.  When asked to further clarify from whom he was treated differently, plaintiff would only explain, "Me as an individual versus a lot of other people, even people in my neighborhood do all kinds of illegal stuff."  Id.  In his memorandum, plaintiff also cites his allegation that the police referred to him and his wife as "squatters."  Opp'n 27.  Such vague and general conclusory assertions fall far short of showing the existence of "similarly situated" persons required by the law, much less the existence of differential treatment based on a protected class.  See Doe v. Vill. of Mamaroneck, 462 F. Supp. 2d 520, 555 (S.D.N.Y. 2006) (stating of plaintiff's contention that he was treated differently from "all other persons in Mamaroneck" that it "border[ed] on the ridiculous").

17

protection claim must be dismissed.  Doe v. Vill. of Mamaroneck, 462 F. Supp. 2d 520, 555 (S.D.N.Y. 2006).

## G.     Unconstitutional Conditions of Confinement

In his memorandum of law, plaintiff bases his argument that the conditions of his confinement were unconstitutional on the fact that he was held "in custody for at least 22 hours" without, he argues, probable cause or a valid warrant.  Opp'n 27.  This theory of liability focuses on the fact of plaintiff's arrest and confinement rather than on the conditions of his confinement.  Accordingly, there is no distinction between this claim and plaintiff's claim for false arrest and imprisonment, which has already been adequately addressed above.[14]

To the extent that plaintiff's complaint can be construed to raise a separate unconstitutional conditions of confinement claim based on his allegations that he was subjected to second-hand cigarette smoke against his protestations, this claim must also be dismissed.  Plaintiff has not alleged the presence, much less the requisite personal involvement, of the named defendants when other prisoners were allowed to smoke on the van ride to central booking.  See, e.g., Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quotation marks and citation omitted) ("It is well settled in this Circuit that personal involvement of defendants in alleged

---

[14] The court notes that, to the extent that an unconstitutional confinement claim based on length of detention may be available, plaintiff has not pointed to any facts that would make out such a claim.  Regarding a potential claim of unreasonable detention, the Supreme Court has held that detention of more than forty-eight hours before a probable-cause hearing is presumptively unreasonable.  Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991).  A shorter detention, as alleged here, may raise a § 1983 claim if the detention is unreasonably prolonged for reasons such as "gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."  Id.; see also Bryant v. City of N.Y., 404 F.3d 128, 137 (2d Cir. 2005) (discussing McLaughlin).  Plaintiff has alleged no such reasons here.  Regarding a potential claim of unconstitutional conditions of confinement, the court must consider whether the "challenged conditions amount to 'punishment' without due process of law."  Cruz v. Reiner, No. 11 Civ. 2131 (BMC)(SMG), 2011 WL 6204101, at *4 (E.D.N.Y. Dec. 12, 2011) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)).  Plaintiff must show a deprivation that is serious enough to amount to a denial of "the minimal civilized measures of life's necessities," and a "sufficiently culpable state of mind" on the part of the defendant.  Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  Plaintiff's assertion that he was held for twenty-two hours does not rise to this standard.

18

constitutional deprivations is a prerequisite to an award of damages under § 1983."). As a result, this claim must also be dismissed.[15]

**H.** <u>**Municipal Liability**</u>

In order to sustain a § 1983 claim against a municipal defendant, a plaintiff must show the existence of an officially adopted policy or custom that caused injury, and a direct causal connection between that policy or custom and the deprivation of a constitutional right. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978); <u>Jones v. Town of E. Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012). Here, plaintiff has not shown an underlying deprivation of a constitutional right, and accordingly his <u>Monell</u> claim against the City cannot survive.

## CONCLUSION

For the forgoing reasons, defendants' motion for summary judgment is granted. Plaintiff's § 1983 claims against all defendants are dismissed with prejudice. Because all of plaintiff's federal claims are dismissed, any state law claims are also dismissed without prejudice. <u>See</u> <u>Giordano v. City of N.Y.</u>, 274 F.3d 740, 754 (2d Cir. 2001). The Clerk of the Court is directed to enter judgment and close the case.

SO ORDERED.

                                                                           /s/
                                                                        Allyne R. Ross
                                                                        United States District Judge

Dated:         March 4, 2014
                Brooklyn, New York

---

[15] Moreover, plaintiff's claim could also be dismissed on the alternative ground that his exposure to second-hand smoke for approximately twenty to thirty minutes was not sufficiently serious to state a constitutional claim. <u>See</u> <u>Giglieri v. N.Y.C. Dep't of Corr.</u>, No. 95 CIV. 6853, 1997 WL 419250 (S.D.N.Y. July 25, 1997) (finding that plaintiff had not shown a sufficiently serious violation to state a constitutional claim where he alleged that he was exposed to second-hand smoke for "at least forty-five minutes" on several occasions while incarcerated).